The third case for argument today, which I'm sure you know, is Square-Malaysia Gray v. Alabama Great Southern Railroad Company. Mr. Sori? Yes, sir. May it please the court. Your Honor, we're here today to ask this court to reverse granting a summary judgment in the lower court in an FALA case. And because of that, most of my argument will be fact-based because we feel where our basic argument is. If we had to sum up this case in two words, I think I would use the two words, training and warning. And Mr. Miller was an employee of the AGS for 45 days. Mr. Miller had been trained at the AGS center in McDonough, Georgia for 19 days. And while at McDonough, he was trained using the universal method of coupling. First, the locomotive approaches the car. The switchman watching the car to be coupled counts down the engineer, usually by car lengths, like three, two, one, half. That will do, and they stop. And that's the normal way of doing a switching operation in the railroad industry. Now, once the coupling is made, then the locomotive stops, allows the switchman to couple in the air with the flat hands, and that's so the car can then use the air brake system of the entire train. Then the car is pulled backwards to make sure that the coupling has actually made and not come loose. And at that point, the switchman orders the locomotive to go forward to the next switching operation. In this particular case, the engineer was in the locomotive approximately 22 cars away from where the coupling was to be made. So, therefore, the switchman at the coupling was the eyes and ears of the engineer, and they only were able to communicate by radio. It is undisputed that the training coordinator at McDonnell, the AGS Center, and the National Transportation Safety Board, that AGS did not teach a method called rolling couples, which I will get into more in just a second. They didn't teach this method at McDonnell. There is nothing written in their rules about rolling couplings, nor does the AGS have any guidelines that explains what rolling couplings are or how they operate. After Mr. Miller's 19 days of... One question. Sure. Do they have that guidelines about the normal way to couple? Yes, ma'am. Yes, ma'am. It's in the safety rules and the operating rules. And sometimes you even have more than that. But, yes, ma'am, it's in the safety rules. What's that third one? Hazmat? I'm sorry? The third type of rules? Hazmat. Hazard material. Okay. All right. After his 19 days of training, Miller was assigned two supervisors to be in charge of his on-the-job training. AGS had recognized that the 19 days of whirlwind training at McDonnell is not sufficient to make a person a trainer. So, therefore, they do on-the-job training. And they assigned the train master, Son Sandoval, and the assistant train master, Gooch, as his supervisors for the on-the-job training. Their duties were to choose the type jobs Mr. Miller was to be exposed to and to also choose the mentor for that particular job. Normally, these gentlemen would choose the conductor that was in charge of the particular operation. And that's because that person was normally the one that was most experienced and knew more about what was going on and could direct the neophyte and try to keep him out of trouble. On the 45th day of his employment, Miller was assigned to the Dragon Yard. Now, the Dragon Yard consisted of several liquid gas plants and a small AGS yard. This was right outside of Hattiesburg, Mississippi. It got its name, the Dragon Yard, because the flares that burn at night look like dragons. The purpose of the trains in the Dragon Yard were to remove empty cars and replace or spot, as they call it on the railroad, full cars in their place. Each track held 11 cars. Miller, as a conductor trainee, and that's what he was, they call them CTs or conductor trainees, was met at the beginning of the shift for a required job briefing. Now, a job briefing on the AGS and actually on all the railroads is held before each shift and every time, and this is important, and every time the type job changes, they are to discuss in detail the manner in which the job is to be handled and any special safety measures needed during that operation. It's important to note at this point that Miller was not advised on his first work day at Dragon that the crew used a totally different method of coupling of the cars than what he had been taught at McDonald. Upon entering Dragon Yard, even though their job duties were changing, the crew did not have another job briefing as required by the safety rules. Miller was assigned originally to Conductor Sittleman as the conductor and senior man on the crew as his mentor. Mr. Sittleman had approximately six years' experience as a conductor. Conductor Sittleman then passed Mr. Miller off to Switchman Henderson to be Miller's mentor. Henderson had been a qualified conductor for only eight months at the time of his selection. During the 2015 and part of the first part of 2016, Mr. Henderson was cited for five rule violations of the AGS safety rules. Conductor Sittleman said when he was being asked about the time periods when he had his own mentor, how did your mentor treat you? He stated you always had to work side by side with him and the mentor always kept you within eyesight. As pointed out in our brief at the time of the accident, Mr. Henderson, the switchman and mentor at the time, had no idea of where Miller was or what he was doing. Mr. Henderson, the switchman, called for a bunch. And this was another local term that they used for the rolling coupling. He called for this over the radio. And, of course, Mr. Miller would have heard this over the radio, but he had no idea what he was talking about because nobody had ever told him in training or anywhere else that they were going to use a bunch or the rolling coupling. Now, what the rolling coupling actually was, was the engineer would start the engine. And remember, he was in the engine and he was 22 cars away. He had to rev the engine up enough to push 22 loaded tank cars into that track. And once he started, the first coupling would be made. And then, instead of stopping and going through the procedure I explained a while ago that was Mr. Miller's training, he just kept going, boom, boom, boom, all the way to the end of the track where Mr. Silliman was waiting to tell him, okay, enough. Mr. Silliman was located between the last two cars that would be coupled. How many cars were there to be coupled on that rolling? It was 11 cars. It was 11 empty cars that they were going to couple up and then put the air in and take out of that track and then come back later and put 11 full cars in their place. Which two cars did Mr. Miller get caught between? Which two cars? We don't know. Oh, you don't? No, sir. We don't know. There's no eyewitnesses to the accident. The last accounting, Mr. Henderson stated he was behind it. And then I'm going to get into what Mr. Henderson did. He was still in between and caught with a couple when they found him. He was in between. Oh, I'm sorry, where he was actually found afterwards. Yeah. It was between the first car and the second car. Towards the engine or the other end? No, ma'am, it was the other end. You had your locomotive and 22 cars in front of it that it was actually shoved. You say first and seven. Which end are you talking about? The first two cars that were in the track to be coupled up. And then they were all together 11 in there. And he was found between the first car and the second car after the accident.  No, sir. The first coupling would be between the 22 cars and the first car sitting there. He was between that first car and the next car to be coupled up. Now, at this point it's a little bit, you need a little bit more explanation about the cars and what they do. The locomotive was pushing the 22 car, the loaded cars, and it was to hit the first car and make the coupling. Like I said a while ago, normally they would stop, pull back. That would have given the opportunity for Mr. Miller to do whatever he was doing and get out. In this case, of course, it kept going. Now, these cars, because they're tank cars, have what's called cushion underpinning. And on the cars you have drawbars that stick out like this. On the end of the drawbars you have couplings which catch up. Underneath the drawbars you have what's called cushion underpinning. And this allows the drawbars to expand and go back approximately six feet. And the reason they do that is because they get banged around. They get pushed. They have to go back. Then they go forward. They'll spread out and then they'll bunch up and they'll get closer. They have to go up the hills. They have to go around curves. So each car has about a three-foot radius that it can expand. And when these cars, these 22 loaded cars, hit that first car and didn't stop, it was just like somebody had exploded into that empty car and it's going to jerk out and go at least those three feet in addition to the momentum pushing behind them and it'll keep going. Now, Conductor Henderson. Before you get too much further, I don't want you to run out of time. All right. You emphasized that this case is about training. Did you raise a failure to train or inadequate training issue in the district court? And if so, can you tell me where in the record? Well, we discussed it in our answers to the motion for summary judgment and we talked about it in general in the negligence that Mr. Miller was not aware of the type method that was going to be used in the training. Did you allege inadequate training as a claim? Yes, ma'am. Okay. They say you didn't. I just want to know where in the record. I can't point specifically to you. There's a dispute about that, so I'm just trying to. Yes, ma'am. We did. Conductor Henderson admitted at the time of the accident that he was facing the homecoming locomotive and the 22 cut-up cars. He further admitted he had no idea where Mr. Miller was located when he realized he didn't try to stop the train. I'm sorry. That's all right. There were no eyewitnesses to this accident at all. And I want to point out a couple things because I'm just about out of time. The district court found that Mr. Miller entered the track when the train was moving, and there were no eyewitnesses. This was a conclusion that the court came up with without any evidence to back it up at all. It's just as plausible that Mr. Miller could have gone between the cars, trying to fix whatever he was doing while the cars were still sitting still, and then the locomotive came in and hit the car behind him and jumped and pinned him. He was actually found at the time facing the homecoming car. The coupling actually coupled completely around his hilt and caught him right in the middle, which is a very unusual situation. You rarely see that. In the 40 years I've been practicing FELA law, I've never seen anything like that. So the conclusion we feel by the lower court that he moved in between the cars at the time the cars were moving is just not backed up by the evidence in the case. It's not ruled out by the evidence either, though. Pardon? It's not ruled out by the evidence either, is it? It's not ruled out by the evidence either. That's correct, Judge. It's the same thing. We just really don't know because nobody saw the accident. It was unwitnessed. Mr. Henderson didn't know where he was at the time, even though he was his mentor. So therefore, we won't ever know at this point. Did anybody estimate the time it took the 22 cars to reach the first uncoupled car? I mean, did it take 5, 10 minutes? We don't really know, and there was no testimony about how long it actually took for it to get there. I do think that he did count him down 3-2-1, which would have been approximately 3 cars away, which is roughly, they figure, a car at 50 feet each. So we're talking about 150 feet away from the original coupling. Okay. And that's just surmising from the evidence. Thank you. Thank you, sir. Mr. Entrecott. Good morning. May it please the Court, Counsel Romney Entrecott, on behalf of the Alabama Great Southern Railroad Company. The case before the Court today is really very straightforward, and Judge Sterritt granted summary judgment in favor of the railroad on a very precise point of law, and that is this. That on the night of August 12, 2015, it was not foreseeable that Gregory Miller would ignore his training, disregard his personal safety, and step between moving equipment, effectively taking his own life. And the reason that Mr. Miller's actions were completely unforeseeable by AGS is that Mr. Miller had undergone specific training regarding how to safely work around live track. He had also been tested and made a perfect score on the precautions to use when crossing over live track. And finally, he had demonstrated his knowledge of the proper procedure for requesting to cross over live track just minutes before this accident occurred. And we have to remember in this case and any FELA case that foreseeability is required before the railroad has breached any duty. And Judge Sterritt's grant of summary judgment was proper when you begin by looking at what the Federal Employers' Liability Act really is. And we look at some familiar principles to build on what Judge Sterritt did in his lower court opinion. Did Judge Sterritt explain why it was not negligence to put this man under training into this yard without ever having heard of or seen or participated in a rolling stop of several cars? That's a great question, Your Honor, and it brings in several different parts of the case. And let me start there. Factually, if you look at the testimony of Mr. Silliman, the senior ground employee on this night, he was the conductor. He says that before this crew worked the Lonestar facility, which is H82, that they worked the facility before working at Lonestar, which is H84. And if you look at pages 27 to 37 of his deposition, you'll see that they had worked a gas-transloading facility identical to Lonestar just prior to coming to the Lonestar facility to do this work, which meant that they removed cars and then spotted new cars in the exact same manner that they used at Lonestar. Did he specifically testify that they used a rolling coupling? Yes, yes. Page 27 to 37 in his deposition, they specifically used a rolling coupling at the H84 site before they came and worked Lonestar, which is where the accident happened. This was Silliman's deposition? Silliman's deposition, 27 to 37. So are you saying, Mr. Christian, it's undisputed that the deceased had experienced rolling coupling before he was killed? Even the hour or two before this accident, he had been part of a rolling coupling. Was there any evidence, either from that deposition or otherwise, that he had been trained on it, meaning before that early operation started, he had been given some guidance about what to expect? It's one thing to have seen it happen, but did he have the overall procedure described to him? Is that part of the testimony, deposition? Let me answer it by making two points that I think are important, Judge Southwick. First of all— You never have just one answer to our questions. Well, I didn't get far into my argument, so some of these things I would have talked about at a different time. First of all, when you are trained at McDonough, Georgia, you're trained on how the railroad operates in a general sense, and then you go to a territory. That territory may service gas transloading facilities, which have a specific way of spotting and coupling cars. You may work at a coal facility. You may work at a gravel facility. You may work at a different facility. But after you leave McDonough, Georgia, you work with a local crew to learn different techniques for building and dismantling trains. That's what was going on in the 25 days that Mr. Miller was down working with a local crew in the region between Meridian and Hattiesburg. So you're never trained at McDonough, Georgia, on the specifics of how you address industries. That's done at the local level based on the territory that you're working in. So the fact that he wasn't trained on a rolling coupling may mean that there aren't many facilities where you have the cars spotted ten feet apart like you do at this transloading facility. But what he was trained on is how to move over live track. That's the most important comment I will make to the court today. You do not cross over live track whether it's a couple and stretch and couple and stretch train loading maneuver or if you do a walking speed couple, couple, couple. You never cross over live track without getting protection to do so. All that means is that definitely, I mean, it seems to me that that would support that he definitely was negligent. But it is not found in the FELA that the railroad also contributed in some way with its own negligence. And so it seems to me even if you accept this, I think we must, he was negligent to have put himself in that position. If failure to understand what was going on out there and what to anticipate, whatever reason he may have decided to violate this three-step approach before crossing tracks, he would need a reason to know the dangers of it. And that, it seems to me, is the main thing you have on that is what you just told us, that he had experienced that in the previous yard that same day, night, that same work day. Bad testimony is in the deposition about the loading facility immediately prior to Longstar. But let me make another comment that I think is important for the court to understand. These ground employees build and dismantle trains all day long. They have to get three-step protection all day, every hour of every day to build trains because you cannot be around live track when a locomotive is attached to cars because things can move. And so that's what Judge Sterritt looked at. He looked at the fact that the railroad had identified a hazard crossing over live track and then said, did the railroad address that hazard with a precaution? Initiating the three-step rule of protection was the precaution that the railroad assigned to that hazard. Then he looked at the facts of this case. Had Mr. Miller been trained on how to safely cross live track? Yes, he had. He actually made a 100 on a specific examination on how do you cross live track. But when he left and went to a territory, he would have been part of a crew that every hour of every day would have gotten three-step protection to build and dismantle trains. This was nothing new to him. And to say that this coupling was done in a manner that would have been difficult for him to understand is really an overstatement of what was happening. At two miles an hour, because the cars were spotted ten feet apart, there was a couple two-mile-an-hour walking speed, couple two-mile-an-hour walking speed, couple. There's nothing about that that would cause Mr. Miller to ignore his training that I cannot be around live track unless I have three-step protection. Let's go back to Judge Hathaway's question. What evidence was there about the rolling coupling that occurred at the prior facility? At the prior facility, they did a rolling coupling to work what's called the H84 industry. They finished that. Then they came to Lonestar. Any instruction about it? Is there any discussion of what he was told? There's not a discussion about specifically what he was told about the rolling coupling, but also look at Mr. Silliman's deposition regarding job briefings, because when he reported to work at 3 o'clock that afternoon in the Hattiesburg yard, they had a job briefing and said, we're going to work these transloading gas facilities tonight. Well, they worked them the same way because the cars are spotted at each facility the same way. But every time they finish a job and take a break, Mr. Silliman says at page 14 through 17 of his deposition, we have a safety briefing to talk about what we're about to do next, which means that when they became ready to do the Lonestar coupling and car assembly maneuver, they had a safety break and said, this is what we're going to do, a safety briefing. And he would have been a part of a rolling coupling just an hour or two before at the H84 industry and would have been told by Mr. Silliman, we're about to do another identical maneuver to do the same thing at this next gas facility. Would have been or was? Was. He was. Was told. Silliman's depo, page 14 to 17. Yes, Your Honor. 14 to 17. Counsel, fair point. I don't see that Judge Sterrett relied on what you're telling us. De novo review, it doesn't really matter that much. So Judge Sterrett says Miller was negligently supervised for reasons we've probably been discussing as the argument. Failure to anticipate negligence such as Miller's negligence, not requesting three-step, is not actionable. It seems to me that is right to a degree, but it does seem to me under the FELA, if the railroad is negligent in any way, that is a basis for liability even though the worker was negligent. Is that an accurate statement? In any way that led as part of causation. I mean, it has to have affected in some way the injury. Not completely, Your Honor. And I think it's important to remember that Judge Sterrett never got to causation in this case. He stopped at duty and breach. And he did it through two cases, and if you'll allow me to explain those two cases, they're the Reardon v. Peoria railroad case, which is a Seventh Circuit summary judgment from 1994, and also the Seymour case, which is a U.S. District Court case from Mississippi. Briefly, Reardon was a locomotive engineer who, when he was passing by a neighborhood, someone shot a pellet gun and he lost his eye. And when he brought his complaint under the FELA, he said three things were possible that the railroad could have done to prevent this injury. One, they could have had guards patrolling the neighborhood. Two, they could have put in glass in the locomotive that would be preventative for a bullet or an object to come into the locomotive. Or three, that they could have required the crew to wear goggles. And so the court looked at those arguments and said, wait a minute, one of the things that you have asserted that would prevent this incident was already in place on this locomotive, and it was tempered safety glass. The problem for the plaintiff is he had this window open, and the court said when the railroad has identified a hazard and then applied a precaution to meet that hazard, and if the precaution had been used, the injury would have been avoided. The railroad met its duty to foresee the possibility of an injury, and if the injury is not possible, if the precaution is used, that's the end of the analysis. The railroad met the duty, and there was no breach. And that's what Judge Sterritt determined in this case, that there was a safety rule. Well, there's a hazard crossing over live track. There's a safety precaution that these employees use every hour of every day on how to cross over live track. And if Mr. Miller, who had been trained, he made 100 on his exam and had used it according to radio communications just minutes before the accident, the question for Judge Sterritt is, in light of those facts, was it foreseeable that he would ignore his training and move between live track with moving equipment on the track at the time that he did? And that's what Judge Sterritt determined no. There was no foreseeability. Therefore, there was no breach of duty on the part of the railroad, and he never got to causation. It's the same analysis that is every rule violation going to give the railroad this defense and entitle the railroad to summary judgment? If the precaution will prevent the accident from occurring, you have to say the railroad met its duty. But in this case, let's say Mr. Miller had diabetes, and an hour before the accident he became sick and he was no longer lucid, he wasn't answering questions appropriately, and the crew put him on the ground around live track in that condition. And then he stepped between moving equipment. He violated the three-step rule. Well, that would not be negligence on the part of Mr. Miller because he would not have been capable of complying with the rule. So not every violation of the rule leads to this foreseeability analysis of duty and breach. What about Mr. Henderson's negligence in allowing him to get out of his sight? Well, I understand that argument from the plaintiffs, and I don't call it a red herring because there was a very serious incident that occurred. But we have to remember that the railroad is not an insurer of the safety of its employees, and the railroad has a right to expect its employees to care for their own safety. When Mr. Miller was turned and observed by Mr. Henderson, he was standing either 15 to 25 feet away. He wasn't giving any indication that he was confused or was going to do anything dangerous. And so the shove move began, and Mr. Henderson began walking back. And when he turned and saw a dart, he said, that'll do. The train stopped, and that's when we found Mr. Miller. But supervising under plaintiffs' analogy would be to hold on to the guy, and we then take away the railroad's right to expect an employee to take care for their own safety, especially when they've been trained on how to maneuver around live track. Is there any evidence that he'd been exposed to a rolling coupling on other days? Not in the record. I think we can infer that because he had been working between Meridian and Hattiesburg for 25 days, but there's no other evidence other than Mr. Silliman's testimony. We don't know if he'd been at Lone Star facility before. This was the first time he had worked with this unique crew. He had worked with Mr. Henderson one other day, but I can't say that he had been working with other crews doing these gas transloading facilities. It's just not in the record. But we do know he did it that night at the H-82 and then an hour or two later at Lone Star. And what did he do? Who described what he did at H-82, the one before where he got killed? They had the identical setup. These are the Tatum salt domes around Hattiesburg, and they store liquefied natural gas in the salt domes. So you put in 11 field cars. They dump those liquefied petroleum products into the salt domes to be stored. Then the railroad comes and removes the 11 cars that are empty and brings back 11 field cars that will then go back into the Tatum salt domes. But they swing out a catwalk so that they can get to the tank car and offload the product. So they have to spot them according to where the apparatus that the transloading facility is using. They have to spot it based on the customer's needs, which ends up being about 10 feet between cars. So they would have used the identical maneuver of grabbing 11 cars, taking them out, and then spotting 11 new cars that were filled with liquefied petroleum. Did somebody testify as to what actually happened on that occasion at the 82, whatever you call it? The H-84, Mr. Silliman said that they used a rolling coupling or a continuous shove at that facility. Mr. Silliman? Mr. Silliman. So we need to focus on his testimony as to that prior occasion. Yes. What did he say? Did he say anything about? Mr. Sorey asked him, what jobs did y'all do that night? And he said, well, first we worked the H-84. And he said, how would y'all work that? And he said, we would spot cars the same way and we would pick up cars the same way. Did you use this rolling coupling maneuver when you worked that facility? And he said, yes, we did. And so they used the identical 11-car pickup and 11-car delivery at H-84 that they did at H-82. Mr. Silliman described Mr. Miller's performance. Did he? He did not. You say in your brief, if I recall correctly, that inadequate training was not raised in the district court. Am I remembering that correctly? You're remembering that correctly. What was raised was inadequate supervision, but the inadequate training element, I'm guessing it was alluded to at some point in the discovery of the case, but I don't think the inadequate training was focused on as much as inadequate supervision was. Degree of focus is one thing. Was it raised or not? I'm not sure I can answer that question. I'd have to look specifically at the brief. What is the inadequate supervision that your opponents charge? The inadequate supervision argument is the one I addressed just a moment ago about, I think you start with the railroad not being an insurer of the safety of its employees, and then you move to the Atlantic Coast v. Dixon case that says the railroad has a right to expect its employees to care for their own safety. And so to cause us to be any more supervisory to prevent this accident would have required us to physically contact and hold Mr. Miller, which is making us an insurer of the safety of our employees, which is not the law under the Federal Employers Liability Act. Nobody said they noticed him doing anything careless or wrong. No, Your Honor. He was corrected or anything? No evidence at all. The last time he was observed, he was acting normally, and Mr. Henderson saw him standing near the tank car one-third to one-half tank car away from him with no indication of unusual behavior at all. Thank you very much. Next. One thing that I forgot to mention a while ago is that this operation took place at night at the time that Mr. Miller was actually trapped. Obviously, AGS realizes that the 19-day training center at McDonough was not sufficient by doing the mentor-mentee on-the-job training. And I do recognize that all railroads do on-the-job training. But all railroads also have a mentor-mentee. And as Mr. Silliman said, when he went through the program, his conductor that he worked with would require him to work side-by-side with him and never let him out of his eyesight. Now, Mr. Henderson referenced Mr. Henderson turning and glancing at Mr. Miller for the last time. And then, undeniably, he said he turned and faced the locomotive and the 22 tank cars coming for the coupling and that he never saw Mr. Miller anymore. He didn't know where Mr. Miller was, and he didn't know what Mr. Miller was doing. On the test, one thing we don't know is how many times Mr. Miller took the test. At McDonough, you take the test until you pass it, and that was the testimony. What do you make of the Silliman deposition that he had gone through a rolling coupling earlier process, earlier that night, and would have experienced it, would have seen how it worked? The only thing that I can recall from that is that he had mentioned they had worked at another place. I do not remember anything in there about a rolling coupling, using a rolling coupling, and especially not explaining what a rolling coupling was. My thought was this was the first opportunity that he had, Mr. Miller, to be exposed to a rolling coupling. And at this point, I'm sticking with that statement. The deposition will say what it says. It's either there or it's not, and I don't remember it being there, to be honest. When Mr. Miller or someone in his capacity to do one of these rolling couplings, did the employee have to, after the way, if it had happened the way it's supposed to have happened, Mr. Miller would have stayed on the side away from the rail until the cars had collided and partially coupled. Correct. And then did he have to go in between and over the couplings or under them to do his duties? Not at that point. The way the rolling coupling works, and as far as I know, this is the only place in the United States with AGS or anybody else that uses a rolling coupling. They just continually keep going. It's like a string of pearls. They clap. They get to in between the 10th and 11th car, and Mr. Sullivan was there and said, he makes them stop, and then after they stop, they go in between cars and hook up the air hoses and get ready to pull it out. What I'm asking is to do that, does a man have to get on the other side of the track? I'm trying to use my imagination about why Mr. Miller would have done this, and the only thing that's occurred to me is maybe he thought it would have been less work or less trouble for him to be on the other side of the track when the cars stopped coupling. I don't know. I'm just asking you, was there a lever or screwing something together? Usually the levers that make the couplings open are on one side or the other, and I honestly can't tell you which side the lever was on in this particular case. And the next thing is we don't know that he was on the other side of the car. There's no evidence to say that he was on the other side of the car. No, I'm not suggesting he was. I'm saying would he have had to go over there after the coupling was over? If he had stayed out of harm's way and the cars did their coupling, he then had to go in between the cars. That's correct. He would have to go in between to hook up the air hose. I'm just suggesting to you maybe somebody in this situation thought, Well, this first car, I'll get on the other side before it couples. It would be less trouble for me to be over there. And that's something we just don't know and won't know really. We see on the railroad if the couplings are not open, in other words, if one is closed and they're going to be coupling up, they will bounce off of each other. So the couplings itself, they both have to be open. We've seen so many times guys reach in there or go in there and straighten the coupling up to make sure that it will make a coupling. Again, that's a guess on our part. We don't know. We've tried to find reasons why he would be in there. There had to have been a reason for him to think that he could go in there. He didn't know that the cars were going to keep coming. And that made the difference, and that's what caused him to get pinned between the two cars. And you don't know anything about this previous 84? I don't remember that there's any evidence in the record that there was a rolling coupling prior to his time at the Dragon Yard. That, to me, was his first exposure. I also don't remember them taking any breaks or having any more job briefings that day because Mr. Henderson said they didn't. Mr. Henderson also said that there was nothing said to Mr. Miller that day as a new conductor trainee about what he should experience in the yard and what would take place and what he had to do. And he said that was unusual for a conductor trainee, especially on his first day of employment in the Dragon Yard. And that's part of our brief and quoted in there, too. Do you know if there was any difference in the cars at the place where he was killed and at the previous place where he might have witnessed or taken part in a rolling coupling? I don't know, and there's no evidence in the record of that either. So there's no way to tell at this point. This peculiarity of this particular car you described earlier with a cushion or something. Unpending. Excuse me. Is that more hazardous, less hazardous? Because it carries liquefied petroleum gas, it's a hazmat car. It has to be certain ways that it can be handled. You don't want them jostling because when they jostle, it spews out the top. And actually, the employees are supposed to be back 10 or 15 feet from the rail in case when they're jostling, the fumes spray out or the petroleum gas somehow or another gets on them. That's one of their safety rules. So Mr. Henderson must have known that Miller was not 15 feet back. Well, he knew that if he glanced at him and actually saw him, he knew that he was not 15 feet back apparently from when he turned to look at him at the one time. But then after that, he turned around and faced the other direction, and Mr. Miller was completely behind him. He had no idea what he was doing or where he was going. Since these cars had liquid in them, should they have even been doing a rolling coupling? Well, that's what I believe. The cars were actually empty that they were picking up. The cars that were loaded were the cars being pushed in there, and they have certain regulations about the speed they can be hit with and they can't be cut loose and things like that, which really didn't play a part in our particular case. I'm sorry. I've gone way over your time. That's fine, Your Honor. Before I sit down, are there any other questions? Thank you. I appreciate it.